**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

GEORGE M. MANOLOVICH III,    )
                             )
    Plaintiff,           )
                             )    **2:08-cv-1746**
    vs.                  )
                             )
BETHEL PARK and ERIC M.      )
ANIBALDI,                    )
                             )
    Defendants.          )

### MEMORANDUM OPINION AND ORDER OF COURT

October 28, 2010

    Presently pending before the Court for disposition is the MOTION FOR SUMMARY

JUDGMENT, with brief in support, filed by defendants Bethel Park and Eric M. Anibaldi

("Anibaldi") (collectively "Defendants") (Document Nos. 24 and 25, respectively); the

OPPOSITION to Defendants' Motion for Summary Judgment filed by George M. Manolovich,

III ("Manolovich" or "Plaintiff"), with brief in support (Document Nos. 29 and 28, respectively);

and the REPLY BRIEF filed by Defendants (Document No. 34). The issues have been fully

briefed and the factual record has also been thoroughly developed via Defendants' CONCISE

STATEMENT OF MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY

JUDGMENT (Document No. 26), Defendants' APPENDIX IN SUPPORT OF ITS MOTION

FOR SUMMARY JUDGMENT (Document No. 27), Plaintiff's COUNTER CONCISE

STATEMENT OF MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR

SUMMARY JUDGMENT (Document No. 30), and Plaintiff's APPENDIX IN OPPOSITION

TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Document No. 28).

Accordingly, the motion is ripe for disposition.

After careful consideration of Defendants' motion, the filings in support and opposition thereto, the memoranda of the parties, the relevant case law, and the record as a whole, the Court finds that there is not sufficient record evidence upon which a reasonable jury could return a verdict for Plaintiff, George M. Manolovich, III, on his federal claims of alleged violations of the Fourth Amendment, and *Monell* claims for failure to train and supervise. The Court will also dismiss without prejudice the additional pendent state claims of alleged reckless misconduct, negligence, and gross negligence.

## PROCEDURAL HISTORY

All of the claims, and the basic issues of this lawsuit, flow from the alleged inappropriate search and seizure by Anibaldi of a Bethel Park Police Department Incident Report ("Police Incident Report"), which he then allegedly disclosed to certain third parties. The Incident Report arguably contains protected privacy-related mental health information about Manolovich.

On December 23, 2008, Manolovich initiated this civil rights lawsuit pursuant to 42 U.S.C. § 1983, by the filing of a two-count Complaint that alleges violations of his constitutional rights and pendent state law claims, against the following parties: the Municipality of Bethel Park ("Bethel Park"); Clifford Morton, Mayor of the Municipality of Bethel Park ("Morton"); the Bethel Park Police Department ("Police Department"); John W. Mackey, Chief of Police and administrator of Bethel Park Police Department ("Mackey"); and Eric M. Anibaldi, a then-detective with the Bethel Park Police Department. Thereafter, Defendants filed a timely Motion

for More Definite Statement Pursuant to Rule 12(e) and a Motion to Dismiss Plaintiff's Complaint Pursuant to Rule 12(b)(6).

By Memorandum Opinion and Order, dated May 21, 2009, the Court denied the Motion for More Definite Statement and granted in part and denied in part the Motion to Dismiss. The Court dismissed all claims against the Police Department, all federal claims brought against Defendants Morton, Mackey and Anibaldi, in their official capacities; all claims for punitive damages against Bethel Park, Morton, Mackey and Anibaldi, in their official capacities; and all pendent state claims for reckless misconduct, negligence, and gross negligence against Bethel Park, the Police Department, and the Individual Defendants Morton, Mackey and Anibaldi, in their official capacities. Furthermore, the Court also dismissed Plaintiff's Fourteenth Amendment Due Process and Equal Protection claim as it found that no where in the Complaint had Plaintiff described with any specificity how Defendants had violated his Fourteenth Amendment Due Process and Equal Protection rights or what recognized fundamental or property right Defendants allegedly had violated and, thus, dismissed that claim.[1]

However, the Court found that, while the allegations of the Complaint were very general, the Complaint contained sufficient facts to support Plaintiff's Fourth Amendment unreasonable search and seizure claim, as well as the pendant state claims of reckless misconduct, negligence, and gross negligence against Defendant Anibaldi, in his individual capacity.

---

[1] Plaintiff argued that "[t]he Fourth Amendment as incorporated by the Fourteenth Amendment prohibits police officers from conducting an unreasonable search and seizure of private information and documents." Pl's Memo. at 4. Based on Plaintiff's response, the Court interpreted Plaintiff's reference to the Fourteenth Amendment in his Complaint as simply an acknowledgement that the freedoms protected by the Fourth Amendment are secured against abridgement by the States through the Fourteenth Amendment. *See* Memorandum Opinion at 10. Plaintiff never sought leave to Amend his Complaint.

Thus, the only claims that remain are a Fourth Amendment search and seizure claim against Anibaldi, a *Monell* claim against Bethel Park for its alleged failure to properly train its employees regarding dissemination of records and information, and the pendant state law claims against Anibaldi, in his individual capacity.

After extensive discovery, Defendants filed the instant Motion for Summary Judgment. Defendants contend that they are entitled to summary judgment because the summary judgment record evidence simply does not support Plaintiff's allegations that Anibaldi engaged "to even the slightest degree" in any of the conduct alleged in the Complaint.

### STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (internal quotation marks omitted).

The mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id*. at 247-48. A dispute over those facts that might affect the outcome of the suit under the governing substantive law, i.e., the material facts, however, will preclude summary judgment. *Id*. at 248. Similarly, summary judgment is improper so long as the dispute over the material facts is genuine. In determining whether the dispute is genuine, the court's function is not to weigh the evidence to determine

whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* It is on this standard, that the Court has reviewed the motion and responses filed by the parties.

## FACTUAL BACKGROUND[2]

As the law requires, all disputed facts and inferences are to be resolved most favorable to the Plaintiff, the non-moving party. Plaintiff alleges that his Fourth Amendment right to protection from an unreasonable search and seizure was violated when Anibaldi unreasonably searched the police computer and then disclosed to third parties a Police Incident Report, which contained mental health information about Manolovich.

It appears thatthe basis of this lawsuit arises from rolling events that occurred between December 13, 2006 and December 27, 2006. The underlying facts of this case are at times unclear and many of the non-material issues of fact are disputed. However, the summary judgment record is clear on the determinative issue: there simply is no summary judgment record evidence from which a reasonable fact finder could conclude that Anibaldi unreasonably searched the police computer during the relevant time period nor is there any summary judgment record evidence from which a reasonable fact finder could find that Anibaldi ever disseminated or disclosed the Police Incident Report or its content to anyone.

---

[2] These facts are taken from the Concise Statement of Material Facts filed by Defendants (Document No. 26), which contains numbered paragraphs and citations to the record in accordance with Local Rule 56.1(B)(1) and the Counter Statement of Material Facts filed by Plaintiff (Document No. 30), which also contains numbered paragraphs and citations to the record. Plaintiff does not dispute the vast majority of statements submitted by Defendants.

A.     Manolovich and Janet Martin

Manolovich and Janet Martin ("Janet") met on December 13, 2006 at a party at the apartment complex in Bethel Park where they both resided.  Shortly thereafter, Janet moved in with Manolovich.   On December 16, 2006, Manolovich attended a family birthday party with Janet.  At this party, Manolovich first met Janet's three sisters:  Patricia Haberman ("Patty"), Nancy Nix ("Nancy") and Lynn Giovannitti ("Lynn") (collectively referred to as the "Sisters"). The Sisters became concerned when they learned that Janet was moving in with Manolovich. Janet is confined to a wheelchair and the Sisters felt that she was vulnerable.   Defs' Concise Stmt of Material Facts, at ¶ 41 (Document No. 26).

B.     The December 2006 Christmas Party

Manolovich attended a Christmas Party with Janet at her sister Lynn's house.[3]  The Sisters were in attendance at the party.  During the evening, Nancy began asking Manolovich personal questions, such as his date of birth, social security number, and details about his divorce.  Manolovich gave Nancy his personal information and knew that the Sisters were going to have an "FBI background check" conducted on him.  *Id*. at ¶ 8.  The Sisters did not tell him who would be conducting the background check.  *Id.* at ¶ 9.

C.     Nancy Contacts Private Investigator

---

[3]     The actual date of the Christmas party is not clear.  Janet testified that the party occurred on December 16, 2006; Nancy testified that the party occurred somewhere between the time Janet decided to move in with Manolovich and Christmas Day, December 25, 2006; and Lynn, the host of the party, testified that the party occurred on Christmas Day, December 25, 2006.

In her deposition, Nancy testified that she spoke with Anibaldi at a personal social dinner[4] and inquired whether he could obtain for her information about Manolovich's background.[5] Both Anibaldi and Nancy testified in their depositions that Anibaldi refused her request and suggested that she hire a private investigator. Nancy testified that shortly after that dinner, she recalled that Patty's nephew, Michael Haberman ("Haberman"), owned his own private investigating company. Nancy contacted Haberman on December 27, 2006, gave him Manolovich's name and personal information, and requested that Haberman get whatever information he could on Manolovich. *Id*. at ¶¶ 47 – 48.

Haberman contacted Nancy later that same day after he had obtained both criminal and civil information on Manolovich via an Internet court portal, the Allegheny County website, and various search engines. Haberman informed Nancy that Manolovich had numerous lawsuits filed against him, had been arrested for driving-related incidents, and had a protection from abuse petition ("PFA") filed against him in 2003 by his then-wife, Terri Louise Berceli ("Berceli").[6] *Id*. at ¶¶ 51 – 55. Haberman testified in his deposition that his background search on Manolovich did not uncover the March 2005 Police Incident Report that is the basis of this lawsuit.

---

[4] Nancy is personal friends with Anibaldi and his wife, Elizabeth, and is the godparent to the Anibaldis' youngest son.

[5] Nancy could not remember if this dinner occurred before or after the Holiday Party, but it certainly occurred after she learned that Janet would be moving in with Manolovich.

[6] Manolovich and Berceli were married from August 14, 1985, until a decree of divorce was granted by the Court of Common Pleas of Allegheny County on December 20, 2004. *See* Affidavit of Terri Louise Berceli, at ¶ 3 (Document No. 28-4).

Haberman further testified that in December 2006 he did not provide any documentation to Nancy; in fact, both Haberman and Nancy testified in their depositions that Haberman did not provide any documentation to Nancy until February 21, 2009, after this lawsuit had been filed. *See* Deposition of Nancy Nix (Document No. 27-6 at 42, 84); Deposition of Michael Haberman (Document No. 27-11 at12-13); *see generally* Document No. 27-19 (documents obtained by Nancy from Haberman). It is not disputed that the Police Incident Report at issue was not among the documentation that Haberman provided to Nancy. *See* Defendants' Concise Stmt of Material Facts No. 79 and Plaintiff's Response to Concise Statement in which Plaintiff admits Paragraph 79. (Document No. 31).

D.   <u>Nancy and Lynn Meet Manolovich's Former In-Laws</u>

Immediately after speaking with Haberman, Nancy contacted her sister Lynn and relayed to her the information that Haberman had discovered about Manolovich. Lynn then conducted her own Internet search on Manolovich, which revealed the address of Manolovich's prior residence. The two sisters then met in person and proceeded to drive to Manolovich's  prior residence where they spoke to the current owners, Debra Colton Miller and her husband, who told Nancy and Lynn about various incidents they knew about which involved Manolovich. The Millers also informed Nancy and Lynn that Manolovich's former in-laws resided down the street.

Nancy and Lynn then drove to that residence and spoke to Manolovich's former in-laws, who informed them about Manolovich's abusive relationship with their daughter, Terri Louise Berceli. The former in-laws then called Berceli, who spoke to Nancy on the telephone.

According to Nancy, Berceli advised her of Manolovich's psychiatric diagnosis and allegedly described an incident wherein Manolovich was involuntarily committed for "running around the Bethel Park Apartment Complex with a gun naked." (Deposition of Nancy Nix, Document No. 27-6 at 25).[7] However, the summary judgment record contains a Sworn Affidavit submitted by Berceli in which she admits to talking to Nancy on the telephone, but denies that she has "knowledge of any incident involving George Manolovich and Bethel Park Police or any allegation that he was found running around his Bethel Park Apartment Complex with a gun while naked." *See* Affidavit of Terri Louise Berceli (Document No. 28-4).

E.      The December 27, 2006 Confrontation Between The Sisters and Manolovich and Janet

Immediately following their conversation with Berceli and her parents, Nancy and Lynn decided to confront Janet with the information they had obtained on Manolovich. Defs' Concise Stmt of Mat. Facts, at ¶ 11. Nancy and Lynn called their sister Patty and asked her to meet them at the apartment Janet shared with Manolovich. Nancy and Lynn waited in the parking lot of the apartment building for Patty to arrive. When Patty arrived, Nancy and Lynn told her what they

---

[7]    The information which Berceli allegedly told Nancy about on the phone does not appear to be the same incident as that which is reflected in the March 2005 Incident Report. Complicating the facts of this case even further is that the summary judgment record reflects that Manolovich has had at least three (3) involuntary commitments, one of which is clearly described in the PFA which was filed against Manolovich by Berceli and which information was obtained by Haberman during his background check of Manolovich (see Document No. 27-19), another which was described by Manolovich in his deposition , and appears to be the same incident as that which is reflected in the March 2005 Police Incident Report, which was not known to Haberman, and a third which occurred on December 26, 2007, a year after the events giving rise to this lawsuit. The Court notes that the information which Lynn and Nancy recall being discussed with Janet differs little from the information contained within the PFA report. *See* Petition and Temporary Order, Protection from Abuse (Document No. 27-19).

had learned about Manolovich.  Nancy told Patty that she had hired[8] a private investigator, but

did not tell Patty that it was her nephew.[9]  The Sisters then proceeded to the apartment to

confront Janet with the information they had learned about Manolovich.

According to Manolovich, the Sisters knocked on his door and came barging through

without either Manolovich or Janet opening the door for them.  The Sisters proceeded to confront

Janet, who was sitting in the bedroom.  Lynn had the background investigation papers in her

hand, and she proceeded to read off different things to Janet which were contained within the

papers.[10]  *Id*. at ¶¶ 12 – 18.  According to Manolovich, Janet read aloud the details of his divorce,

a medical malpractice lawsuit that Manolovich and Berceli had settled out of court, a PFA filed

by Berceli against Plaintiff, and a police incident with the Bethel Park police which resulted in

an involuntary commitment proceeding ("302").[11]  Lynn showed Manolovich the papers in her

---

[8]     Both Haberman and Nancy testified in their depositions that Haberman never charged
Nancy for any of his services.  *See* Defs' Concise Stmt of Mat. Facts, ¶ 56.

[9]     Patty did not find out until 2009 that Nancy had contacted Haberman to obtain the
background information on Manolovich.  Patty testified in her deposition that she was very upset
when she was told that the information came from Haberman.  *Id*. at ¶ 85.

[10]     The summary judgment record reflects that while Lynn was reading from the papers in her
hand, Nancy was leaning down talking to Janet and Patty was listening to everything that was
being said.

[11]     In his deposition, Manolovich described  the information that the Sisters allegedly relayed to
Janet.  Interestingly, however, the incident Manolovich described does not appear to be the 302
proceeding allegedly discussed between Berceli and Nancy.   However, Lynn testified that the
information she relayed to Janet was the incident referenced in the PFA.   Manolovich's
description of the information that the Sisters relayed, on the other hand, may be the same
incident as reflected in the March 2005 Police Incident Report which is the subject of this lawsuit
incident, but the details given by Manolovich differ from those listed in the Police Incident
Report.  *See* Deposition of George Manolovich (Document No. 27-2 at 25).  During his
deposition,  however, Manolovich stated that the incident the Sisters described was, in fact, the
same as the March 2005 incident.

hand, but she never let Manolovich or Janet hold or see the papers. *Id.* at ¶ 13. According to

Manolovich, Lynn told him that she obtained the papers from Anibaldi. Depo. of George

Manolovich (Document No. 27-2 at 23). Manolovich does not know how many pages of papers

were in Lynn's hand, but he testified that "[i]t was one report . . . maybe five, six, eight papers or

something like that" and the pages were stapled together. *Id.* at 24. Manolovich also testified

that although Janet would not show him the papers, he was able to get a glimpse of some of the

papers Janet was holding, but not all of them. *Id.* at 23.

According to Manolovich, he filed this lawsuit based on the statements made by the

Sisters during this confrontation. At some point in time, Patty advised Janet that Anibaldi was

the one who gave Nancy the information on Manolovich because, according to Patty, Nancy told

her that on the night of the confrontation. Defs' Concise Stmt of Mat. Facts, at ¶ 84.


F.   The December 2008 Christmas Party

In December 2008, Manolovich and Janet attended another Christmas party at Lynn's

house. Nancy and Manolovich engaged in a conversation about the instant lawsuit. Nancy told

Manolovich that Anibaldi had not given her any of the information. Nancy was upset that

Manolovich had filed the lawsuit and was afraid that Anibaldi would lose his job. *Id.* at ¶¶ 36 –

38. Nancy maintains that she learned of all the information discussed during the 2006

confrontation from Berceli, Berceli's parents, and Haberman.

G.    The Policies, Procedures and Training of Bethel Park

When Bethel Park hires a police officer, the officer has to go through an intensive field training which includes training on the policies and procedures of the Bethel Park Police Department.  Each police officer is given a manual which contains policies and procedures with regard to the disclosure of information.  The police are bound by the Criminal History Record Information Act and any request for an incident report is cleared through the office of the Chief of Police.  In an Involuntary Commitment  ("302") proceeding, only the basic information would be given out, such as date, time and location of the incident.  A private citizen would not be permitted to obtain any other information with regard to a "302" incident.  Incident reports are kept on the Department's computer records only.  Hard copies are not maintained except in the case of an arrest. The officers have to request hard copies of documents through the records clerk.  *Id.* at ¶¶ 90 – 97.

The Department utilizes a software system called Visual Alert, which is the Department's writing software and it is the database for the activities of the Police Department.  Visual Alert documents any calls for emergency services and information with regarding the incident by assigning a number to the incident.  Visual Alert only contains records of incident reports specific to Bethel Park.  *Id.* at ¶¶ 99 – 100.

Every member of the Bethel Park Police Department has access to Visual Alert.  The Chief of Police can run a query in Visual Alert to determine the identity of anyone who accessed incident reports.  Chief of Police John W. Mackey[12] testified, that pursuant to Plaintiff's discovery request, he performed a query on Visual Alert to determine whether Anibaldi had ever

---

[12]    Chief Mackey has been the Chief of Police of the Bethel Park Police Department for the past ten (10) years and was the Chief of Police when Anibaldi was hired.

accessed any reports which regard to Manolovich. The search indicated that Anibaldi accessed the subject Police Incident Report on December 1, 2005, to perform an edit in a name field. Significantly, the search reflected that Anibaldi did not print the report and that Anibaldi has not accessed the report at any other time.

The Department also has access to a state Commonwealth database called CLEAN. The Department dispatchers use CLEAN to send out bulletins to police departments and to search for information such as Department of Motor Vehicle records and criminal history records. Only current PFA's can be accessed through CLEAN. *Id.* at ¶¶ 119, 122.

Only a certified operator can access CLEAN information. Anibaldi is not certified to use CLEAN. The Department maintains a log book that officers and dispatchers are required to complete any time they make a query through CLEAN. Chief Mackey made a request through the Pennsylvania State Police as to any queries made by anyone at the Bethel Park Police Department on Manolovich. The query results returned showed that Manolovich's record was searched three (3) times: on March 14, 2005; September 3, 2005; and December 30, 2005. All three (3) searches were done on Manolovich's driver's license. *Id.* at ¶¶ 123 – 128.

Officer Scott Zinsmeister, the Department's Computer Administrator, testified during his deposition that no member of the Bethel Park Police Department, including Anibaldi, accessed any of Manolovich's records in December of 2006. *See* Depo. of Scott Zinsmeister (Document No. 27-16 at 57).

H.    Defendant Eric M. Anibaldi

Anibaldi has been employed with the Bethel Park Police Department since May 28, 2002. He started out as a patrolman and moved to the position of Detective in October 2005.  Anibaldi worked in the position of Detective until October 2008, when he returned to being a patrolman. Anibaldi has never been disciplined for any misconduct.  Defs' Concise Stmt of Mat. Facts, at ¶¶ 130 – 131.

Anibaldi testified  that he has no specific recollection of ever running Manolovich's name through the Department's in-house computer system.  *Id.* at ¶ 141.

Anibaldi was not involved in Manolovich's 302 commitment in March of 2005.  *Id.* at ¶ 20.  He testified that he does not recall why he accessed the Police Incident Report in December 2005 and stated that he only reviewed and read the March 2005 Police Incident Report after this lawsuit was filed.  Anibaldi denies that he disseminated the March 25, 2005 Police Incident Report and further testified that, pursuant to department policy, he would not be allowed to disseminate any of the information contained in the Police Incident Report.  *See* Depo. of Eric Anibaldi (Document No. 27-1, at 32-33).


**DISCUSSION**

Both Anibaldi and Bethel Park have moved for summary judgment.  Anibaldi argues that the summary judgment record is void of any evidence which demonstrates that he conducted an unreasonable search or seizure or that he disseminated to a third party the actual Police Incident Report or the information contained therein.  Thus, according to Defendants, Plaintiff has failed to establish a violation of his Fourth Amendment rights. As a result, Defendants argue that

14

Bethel Park is entitled to summary judgment as Plaintiff is unable to establish any *Monell* liability against it.

A.      Claims Against Anibaldi

Section 1983 of title 42 of the United States Code does not create substantive rights, but rather provides a remedy for the violation of rights created by federal law. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985). As in any case brought under § 1983, the Court must proceed to "identify the exact contours of the underlying right said to have been violated." *County of Sacramento v. Lewis*, 523 U.S. 833, 842, n. 5 (1998).

A *prima facie* case under § 1983 requires a plaintiff to demonstrate: (1) that the alleged wrongful conduct was committed by a person acting under color of state law; and (2) that the conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000). Both elements must be present to sustain a § 1983 claim.

It is not disputed that Anibaldi was a state actor at all relevant times. Therefore, the remaining analysis focuses only the second prong of the *prima facie* case, *i.e.* has Plaintiff demonstrated that his Fourth Amendment right to be free from an unreasonable search and seizure was violated by Defendants.[13]

In the instant case, in order for Plaintiff to establish his *prima facie* case, the summary judgment record must demonstrate that the actions of the Defendants, namely Anibaldi (i)

_____

[13]     The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. . . ." U.S. CONST. amend. IV.

constituted a "search and seizure" within the meaning of the Fourth Amendment and (2) that

such search and seizure was "unreasonable." *See e.g. Brower v. County of Inyo*, 489 U.S. 593

(1989).[14]

Defendants contend that Manolovich has not produced any evidence to establish that

Anibaldi conducted an "unreasonable" search or seizure, much less accessed and/or divulged the

Police Incident Report during the relevant time period. The Court agrees.

The Fourth Amendment of the United States Constitution protects individuals from

"unreasonable searches and seizures." U.S. CONST. amend. IV. The Court of Appeals for the

Third Circuit has stated the following:

> The fundamental task of any Fourth Amendment analysis is assessing the
> reasonableness of the government search. If the search is reasonable, there is no
> constitutional problem, for the Fourth Amendment only protects individuals from
> unreasonable searches and seizures. Determining whether a search is reasonable
> depends on all the circumstances surrounding the search or seizure and the nature
> of the search or seizure itself, and involves balancing on the one hand, the degree
> to which [the search] intrudes upon an individual's privacy and, on the other
> hand, the degree to which [the search] is needed for the promotion of legitimate
> government interests.

*United States v. Sczubelek*, 402 F.3d 175, 182 (3d Cir. 2005) (citations and quotation marks

omitted).

The Court finds that Plaintiff has failed to produce any record evidence from which a

reasonable fact finder could determine that Anibaldi's conduct at any time violated Manolovich's

---

[14]    Plaintiff frames the issue as whether Anibaldi <u>disclosed</u> private information. However,
under a Fourth Amendment claim, as Plaintiff has pled, the initial issue must be whether the
record contains sufficient evidence from which a fact finder could determine that Anibaldi
conducted an unreasonable search and seizure. Only if the Court finds the answer to that issue in
the affirmative, would it be necessary to determine whether the record contains sufficient
evidence from which a fact finder could determine whether the alleged disclosure involved
private information.

Fourth Amendment rights.[15]  For example, it is undisputed that in 2005 Anibaldi accessed the subject Police Incident Report, a record maintained by his own police department.  It is hard to grasp how this conduct alone would constitute an actionable claim for an unlawful search and seizure under the Fourth Amendment.

Furthermore, the police department's system log confirms that Anibaldi did not access the Police Incident Report at any time during the relevant time period.  The system log reflects that Anibaldi accessed the Police Incident Report on only one occasion in December 2005 and that he has never printed the Police Incident Report.  The Police Department's Computer Administrator testified that no member of the Bethel Park Police Department, including Anibaldi, accessed any of Manolovich's records in December of 2006.

Plaintiff, however, attempts to create a genuine issue of material fact regarding the validity of the information on the computer log.  Specifically, Manolovich argues as follows:

> The only individual who [Nancy] Nix had contact with and who had knowledge relating to plaintiff's mental health involuntary commitment was the defendant, Eric Anibaldi.  Anibaldi had accessed the incident report on Bethel Park's Visual Alert computer system.  Although this access allegedly occurred in December of 2005, there are questions of fact relating to the validity of the information on the computer log which is not a secure database.

---

[15]     The Court recognizes that courts have held that the disclosure of private information contained within a police report is protected under a Fourteenth Amendment due process violation.  *See e.g., Warner v. Township of South Harrison*, Civil No. 09-6095, 2010 WL 3001969 (July 26, 2010).  However, although Plaintiff in his brief argues that "Plaintiff has privacy rights in the non-disclosure of the events surrounding the 302 proceeding in March 2005," Plaintiff has not alleged a due process / privacy claim.  In fact, in opposition to Defendants' Motion for More Definite Statement and Motion to Dismiss, Plaintiff's counsel specifically stated that "[t]he Fourth Amendment as incorporated by the Fourteenth Amendment prohibits officers from conducting an **unreasonable search and seizure** of private information and documents."  Pl's Memo at 4 (emphasis added).

Pl's Br. in Opp'n at 13 (Document No. 28). In support of his argument, Plaintiff relies upon the purported expert opinion of Alex Alvater ("Alvater") whose opinions are expressed in a letter dated March 26, 2010. Alvater opines that a "computer system without 'outside' logging or records keeping can be tampered with or easily abused . . . [and] [i]t can be made to appear as though no user accessed the file on a particular date." *See* Letter from Alex Alvater (Document No. 28-5). It appears that Plaintiff is attempting to utilize the letter written by Alvater as an expert report. However, for the following reasons, the Court has disregarded the Alvater letter.

First, the Alvater letter does not comport with Federal Rule of Civil Procedure 26(a)(2)(b) and the requirements for disclosure of an expert's written report. Pursuant to Rule 26(a)(2)(b), the expert report must contain the following:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;

> (ii) the data or other information considered by the witness in forming them;

> (iii) any exhibits that will be used to summarize or support them;

> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;

> (v) a list of all other cases in which, during the previous four years, the witness testified as an expert at trial or by deposition; and

> (vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(b). The Alvater letter fails to provide <u>any</u> of this required information.

Moreover, the Alvater letter does not offer any substantive proof of any alleged wrongful conduct of Anibaldi or the Police Department. As Defendants correctly highlight, the majority

of Alvater's statements are qualified, speculative, and conclusory. The Alvater letter does nothing to establish Plaintiff's allegations that Anibaldi improperly accessed the police computer records, printed those records, published the records to a third party, and thereafter altered the computer log. In fact, the plain language of the letter indicates that Alvater has never examined the police department's computer system. Thus, the Court finds that any allegations raised by Plaintiff as to the validity of the information on the police computer log are unsupported and amount to nothing more than mere conjecture and speculation.

Additionally, the summary judgment evidentiary record simply does not support Plaintiff's allegation that Anibaldi disclosed the March 2005 Police Incident Report or its contents to the Sisters. There is no summary judgment record evidence which establishes that Anibaldi publicly disseminated any information concerning the Police Incident Report. Plaintiff is attempting to create a genuine issue of material fact by relying on his own self-serving description of what information the Sisters allegedly relayed to Janet about the March 2005 incident.

In contrast, the summary judgment evidence record is replete with support for Defendants' position. Nowhere does the summary judgment evidence record reflect that the Sisters had information about the events described in the March 2005 Police Incident Report. Nancy testified that all her information came from Berceli, Berceli's parents, or Haberman. Haberman testified that he had no knowledge of the March 2005 involuntary commitment and the documentary evidence of record supports Haberman's testimony, as a copy of the March 2005 Police Incident Report is not among the documents Haberman provided to Nancy. Nancy and Lynn both testified that the information they relayed to Janet involved an involuntary

commitment incident which Berceli told them about and which is reflected in the PFA. This is not the episode reflected in the March 2005 Police Incident Report. Janet testified that she could not recall exactly what the Sisters had relayed to her about Manolovich's commitment. Both Nancy and Anibaldi testified that Anibaldi never provided Nancy with any information about Manolovich.

Finally, it cannot be overlooked that there is a significantly wide factual gap between the information that Manolovich testified that the Sisters relayed to Janet and the information contained in the actual March 2005 Police Incident Report. Based on the testimony of Manolovich, the Sisters relayed much more information than they would have known, even if they had obtained a copy of the March 2005 Police Incident Report. The "facts" that Manolovich testified to are not contained within the Police Incident Report.

Although it is not the role of the trial judge "to weigh the evidence and determine the truth of the matter," *Anderson*, 477 U.S. at 250, plaintiff may not manufacture an issue of disputed fact by relying "upon mere allegations, general denials, or [ ] vague statements." *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir.1991). *See also Scott v. Harris*, -- U.S. --, 127 S. Ct. 1769 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment."). After deliberate consideration, the Court finds that there is no record evidence to

substantiate Plaintiff's claim that the Sisters had knowledge of the March 2005 Police Incident Report.[16]

For all the above stated reasons, summary judgment will be granted to Defendants on Manolovich's claims against Anibaldi.[17]

B.     Municipal Liability Claim Against Bethel Park

In addition to seeking to impose liability on Anibaldi, Plaintiff also seeks to impose § 1983 liability on Bethel Park for its alleged lack and failure to train and supervise, and its lack of safeguards, regulations or policies that would have prevented the alleged disclosure of the March 2005 Police Incident Report.

Because the Court has found that there is no evidence that Anibaldi violated Plaintiff's constitutional rights, concomitantly there is no basis for municipal liability under §1983. Therefore, Bethel Park is entitled to summary judgment. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (where there is no underlying constitutional tort by individual police officers, there can be no liability on the municipality for its  actions either).

---

[16]    Because the Court has found that there was no illegal search and seizure, it is not necessary for the Court to determine whether the March 2005 Police Incident Report and the information contained therein are protected material.

[17]    Plaintiff also argues that the search and alleged disclosure of the Police Incident Report violates his constitutional rights because such disclosure would be in violation of the Pennsylvania Mental Health Procedures Act ("MHPA").  However, a host of well established authority exists which flatly rejects the notion that a violation of a state law, or the existence of statutory protections, has any probative value in a federal court's analysis of a constitutional violation.  *See Virginia v. Moore*, --, U.S. ---, 128 S.Ct. 1598 (2008) (violation of state law is not determinative of whether evidence must be suppressed for Fourth Amendment violation); *California v. Greenwood*, 486 U.S. 35, 44 (1988) ("We have never intimated . . . that whether or not a search is reasonable within the meaning of the Fourth Amendment depends on the law of the particular State in which the search occurs.)

C.  Remaining State Law Pendent Claims For Reckless Misconduct, Negligence, and
    Gross Negligence

In addition to the federal constitutional claims addressed above, Manolovich also brings

state law claims against Anibaldi in his individual capacity for reckless misconduct, negligence,

and gross negligence.  The United States Court of Appeals for the Third Circuit has held that if

the federal counts of a complaint are dismissed then the district court should "ordinarily refrain

from exercising jurisdiction [over the state law claims] in the absence of extraordinary

circumstances."  *Tully v. Mott Supermarkets, Inc.,* 540 F.2d 187, 195-96 (3d Cir. 1976).  *See also*

*Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995) ("Under Gibbs

jurisprudence, where the claims over which the district court has original jurisdiction are

dismissed before trial, the district court must decline to decide the pendent state claims unless

considerations of judicial economy, convenience, and fairness to the parties provide an

affirmative justification for doing so.")

Because the Court is granting summary judgment to Defendants on all of Plaintiff's

federal claims, and given that there are no extraordinary circumstances which would warrant the

exercise of jurisdiction over the pendent state law claims, the Court will decline to exercise

supplemental jurisdiction.  Accordingly, Plaintiff's claims for reckless misconduct, negligence,

and gross negligence under Pennsylvania state law will be dismissed without prejudice.  *Angst v.*

*Mack Trucks, Inc*., 969 F.2d 1530 (3d Cir. 1992) (once all federal claims have been dropped

from the case, the case should either be dismissed or transferred to the Pennsylvania Court of

Common Pleas pursuant to 42 Pa. Cons. Stat. Ann. § 5103(b)).

## CONCLUSION

For the reasons hereinabove stated, summary judgment will be granted to Defendants on Plaintiff's federal claims and the remaining pendent state law claims will be dismissed without prejudice.

An appropriate Order follows.

McVerry, J.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

GEORGE M. MANOLOVICH III,    )
    )
    **Plaintiff,**    )
    )    **2:08-cv-1746**
    **vs.**    )
    )
**BETHEL PARK and ERIC M.**    )
**ANIBALDI,**    )
    )
    **Defendants.**    )

## ORDER OF COURT

**AND NOW,** this 28th day of October, 2010, in accordance with the foregoing

Memorandum Opinion, it is hereby **ORDERED, ADJUDGED AND DECREED** as follows:

1.    The Motion for Summary Judgment filed by Defendants is **GRANTED** as to all federal

claims alleged in Plaintiff's Complaint;

2.    The Pennsylvania pendent state law claims against Anibaldi in his individual capacity for

reckless misconduct, negligence, and gross negligence are DISMISSED without prejudice

forthwith; and

3.    The Clerk shall docket this case closed.

BY THE COURT:

s/Terrence F. McVerry
United States District Court Judge

cc:     Alexander J. Jamiolkowski, Esquire
Egan & Jamiolkowski
Email: ajamiolkowski@comcast.net

Paul D. Krepps, Esquire
Marshall, Dennehey, Warner, Coleman & Goggin
Email: pdkrepps@mdwcg.com

Danielle M. Vugrinovich, Esquire
Marshall, Dennehey, Warner, Coleman & Goggin
Email: dmvugrinovich@mdwcg.com